**E-FILED**
Friday, 29 April, 2016  09:10:36 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| DANIEL A. COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 13-3083 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Daniel A. Cook filed for disability insurance benefits and supplemental security income.

His applications were denied at each step.

After the Appeals Council denied his request for review of the administrative law judge's decision, the Plaintiff filed this action pursuant to 42 U.S.C. § 405(g).

Pending are the Plaintiff's motion for summary judgment and the Defendant's motion for summary affirmance.

The Court grants summary judgment for the Plaintiff.

# I. INTRODUCTION

On April 30, 2010, Plaintiff Daniel A. Cook filed applications for disability insurance benefits and supplemental security income. The Plaintiff was born in 1963 and was 41 years old on September 20, 2004, when he alleged he first became disabled. The onset date of his claimed disability was later amended to May 10, 2008.

The Plaintiff's highest level of formal education is the tenth grade. He has worked as a farm laborer, tire changer, material handler, packager, handyman and fork truck operator.

The Plaintiff's applications were denied initially and on reconsideration. The Plaintiff requested a hearing, which was held on October 27, 2011. He and a vocational expert testified at a video hearing before an administrative law judge ("ALJ"). Following the hearing, ALJ Shreese M. Wilson denied the applications.

# II. BACKGROUND

## A. Medical evidence

In April of 2008, the Plaintiff was seen in the emergency room for

severe back pain.  He was observed having trouble walking and determined to have decreased motion in the back and a positive straight leg testing at five degrees.  An MRI study was negative and revealed no disc herniation, no spinal stenosis, no compression or subluxation of the lumbar vertebral bodies and no osseous destruction.  The Plaintiff was able to walk at least one block in February of 2008.

In August of 2009, the Plaintiff was examined by James Hinchen, M.D., who noted clinical signs of weakness with associated numbness in his left leg, along with diminished reflexes at both knees and ankles and weakness in dorsiflexion and plantar flexion.  The Plaintiff reported having trouble walking and that he had fallen.  Dr. Hinchen observed him walking "haltingly."  Dr. Hinchen noted a significant worsening from the previous visit and emphasized clinical leg weakness.

An MRI on August 10, 2009 revealed no evidence of a herniated disc or spinal stenosis.  It showed large, hypertrophic spurs and facetal hypertrophy at lumbar spine level L4/5, which was causing left foraminal stenosis and spurs encroaching into the neural canal and impinging over the

exiting nerve root.  This was likely due to "advanced degenerative arthritis." Dr. Hinchen concluded the Plaintiff had radiculopathy to the left leg and referred the Plaintiff for an orthopedic specialty examination.

The Plaintiff saw Zeng Y. Wang, M.D., Ph.D., for nerve conduction studies in January of 2010.  Prior to the study, the Plaintiff was determined to have decreased sensation, deep tendon reflexes and diminished muscle strength in the left leg.  Dr. Wang queried whether the Plaintiff had left lumbosacral radiculopathy and the objective EMG test was performed.  It showed "left moderate-to-severe lumbosacral radiculopathy of the nerve roots of L4, L5 and S1," with the conclusion supported by a "finding of active denervation and reinnervation in the L4, L5 and S1-innervated muscles including the lumbosacral paraspinal muscles."

In November of 2009, the Plaintiff was examined by Stephen Pineda, M.D., who reviewed the 2008 MRI (which the emergency room doctor had described as normal) and commented that it actually showed degeneration at L4/5 and L5/S1.  Although he did not review the newer MRI, Dr. Pineda noted that the radiologist's report indicated worsening problems,

4

particularly on the left side.  Dr. Pineda observed that Plaintiff favors his left leg.  The Plaintiff had diminished sensation but was firing his reflexes that day.  Dr. Pineda believed a pain management program was the most appropriate course.

The Plaintiff returned to Dr. Pineda in March of 2010, after the nerve conduction studies.  Dr. Pineda observed that plaintiff "has weakness in his whole left leg.  He has difficulty flexing his hip, flexing and extending his knee, dorsi and plantarflexing his foot."  Dr. Pineda's plans for the Plaintiff were observation and pain management.

In December of 2009, the Plaintiff first saw pain management specialist Naheed Bashir, M.D.  Based on the Plaintiff's complaints, Dr. Bashir noted moderate to severe pain and described moderate impairment of ability to perform activities of daily living.  The pain was described as strong lower back pain radiating to the left leg, accompanied by numbness. The Plaintiff had trouble sleeping.  The objective portion noted a mild to moderate antalgic gait.  The lumbar spine was normal to inspection. However, the Plaintiff had palpable muscle spasms bilaterally in the lumbar

5

spine and diminished motion.  The Plaintiff had hypoesthesia in both legs.
Dr. Bashir prescribed diazepam, hydrocodone, prednisone and morphine
sulfate.  The Plaintiff's overall functioning was noted to be "poor."

In March of 2010, that finding was repeated.  Prednisone was
discontinued and the Plaintiff was prescribed cyclobenzaprine.  Surgery was
not recommended.  The Plaintiff was advised to continue with his current
medications.

In August of 2010, Dr. Bashir noted the Plaintiff recorded leg
cramping pain when walking short distances.  He was given fentanyl
patches and continued to use morphine and hydrocodone for break-through
pain.  The Plaintiff was determined to have either mild or moderate spasms
at every examination.

The Plaintiff is consistently described as having dull aching pain
exacerbated with movement.  Dr. Bashir diagnosed the Plaintiff with
lumbosacral spondylosis without myelopathy, low back pain and
radiculopathy.

In a follow-up physical exam in September of 2011, Dr. Bashir made

diagnoses and observations similar to prior physical exams, except that Plaintiff had only mild low back pain.

### B. Hearing testimony

The Plaintiff testified that his medications such as Morphine caused side effects, including nausea.  He smoked marijuana in order to alleviate the nausea.

The Plaintiff testified that during the drive from Jacksonville to Springfield, Illinois for the hearing, he had to stop twice because of problems with his back.  He described some of the more severe back cramps as akin to an electrical shock.  They would usually last five or ten minutes and occurred at least once a day.  The Plaintiff testified he could stand for five or ten minutes when he leans on something for support.  It was a real chore to walk one block from his car to the hearing site.  The Plaintiff uses a cane that he testified was prescribed by Dr. Hinchen.[1]  Although the Plaintiff said the cane was prescribed to help him with his balance, he now

---

[1]On his application for benefits, the Plaintiff states he does not remember when the cane was prescribed.  He notes the cane was also recommended by a specialist.

used it to get elevation on his leg when walking.  The Plaintiff stated he could not walk a block on uneven ground because of problems tripping and dragging his left leg.

During the hearing, the Plaintiff had trouble sitting all the way back in his chair.  He had to lean forward or off to the side.  The Plaintiff testified he sometimes needed to lay down.  He could lift a gallon of milk, but would have difficulty holding it away from his body.

The Plaintiff testified he would not be able to sit, stand and move around for two hours.  He would have to lay down eventually.  The Plaintiff had good and bad days.  On bad days, he did not leave the house.  The Plaintiff testified that although the pain medications did help, his condition had worsened in the previous two years.  He was suffering for a long time and at times "curled up in a little ball" and cried.

The Plaintiff testified his wife helps him get ready for the day by assisting with certain tasks that are difficult for him to do.  On a typical day, the Plaintiff takes his wife to work and then tries to stay comfortable on the couch.  The Plaintiff would often watch television, read or listen to

music.  Although he does not clean, dust, mop, sweep, vacuum or do any other chores, the Plaintiff would occasionally make a sandwich.  The Plaintiff sometimes drove his wife to the grocery store.  He rarely went inside and typically used a scooter when he did.  The Plaintiff had difficulty sleeping during the night and sometimes tried to nap in the mornings.

The Plaintiff does not typically attend his children's school functions. He does attend educational planning meetings for his daughter.  The school accommodates him by providing a cushioned chair. The Plaintiff does not attend family gatherings, though his wife and children sometimes do.  He found it was hard to remain comfortable at those functions.

A vocational expert testified that a person limited to sedentary work with use of a cane and who needed to alternate positions could perform a number of jobs, but not if the individual's productivity was limited to the point of 80% or if they had to take any extra breaks.

C. ALJ's decision

The ALJ issued a decision on November 4, 2011, finding that

although the Plaintiff had the severe impairment of degenerative disc disease of the lumbar spine, it did not meet or medically equal the severity of a listed impairment.   The ALJ observed that Plaintiff had not demonstrated the requisite physical findings and is able to ambulate effectively and use his hands for fine and gross manipulations.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined under the applicable regulation, except with an alternate sit/stand option once every hour for five minutes and only occasionally stooping, kneeling, crouching, crawling, and climbing of ramps and stairs but no climbing of ladders, ropes or scaffolds.

The ALJ reviewed the medical evidence.  The Plaintiff states the ALJ does not mention Dr. Hinchen's notes, Dr. Pineda's findings and recommendations or Dr. Wang's examination and EMG study, and instead reviews only the MRI from April of 2009 and Dr. Bashir's interventional pain treatment notes.   The ALJ emphasized that Plaintiff's pain was controlled with medications and that the record showed his condition improved with conservative treatment.  Moreover, although the Plaintiff

was referred to a surgeon for evaluation of his back, surgery was not recommended.

While noting that Plaintiff reported fairly limited activities, the ALJ finds "no records or treatment notes to support the limitations the claimant appears to have imposed upon himself." R. 20. The ALJ stated she had considered the onset, nature, duration and intensity of his symptoms, in addition to precipitating and aggravating factors, in assessing his residual functional capacity.

The ALJ further found that while the Plaintiff could not perform past relevant work, he could perform a significant number of jobs in the national economy.

Accordingly, the ALJ found that Plaintiff was not disabled and denied benefits. On January 30, 2013, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. This action followed.

### III. DISCUSSION

A. Standard of review

When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010).  The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Yurt v. Colvin, 758 F.3d 850, 856 (7th Cir. 2014) (citations omitted).  Although the Court's task is not to re-weigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion."  Id. at 856-57.

### B.  ALJ's evaluation at Step Three

At step three, the ALJ must determine whether the claimant's impairment meets or exceeds one of the listing impairments.  If so, the claimant is found to be disabled.  If not, the inquiry continues.

(1)

The Plaintiff asserts the ALJ's analysis at step three of the evaluation process is flawed.  He claims the record shows that he has degenerative disk disease with nerve root compromise, with neuroanatomic distribution of pain consistent with the studies, limitation of motion, weakness, sensory or reflex loss, and a positive straight leg raising test.  Accordingly, the Plaintiff claims he meets the requirements of presumptive disability Listing 1.04A (20 C.F.R. Part 404, Subpart P, Appendix 1, Rule 10.4A), which requires:

> 1.04 Disorders of the Spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

A claimant bears the burden of proving that his condition meets or equals a listed impairment.  See Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  The Plaintiff here asserts the ALJ does not discuss or review the

medical records or evidence that support a listing level impairment.  These include findings by Dr. Hinchen and Dr. Wang.  Dr. Hinchen found clinical signs of weakness with associated numbness in his left leg, diminished reflexes at both his knees and ankles, weakness in dorsiflexion and plantar flexion, and observed that he walked haltingly.  Dr. Hinchen noted the symptoms had worsened over the course of the year and included clinical weakness in the left leg.

The ALJ did not review any of Dr. Wang's clinical findings in January of 2010.  Dr. Wang found medical signs of decreased sensation, decreased tendon reflexes, and diminished muscle strength in the left leg.  The EMG test, which the ALJ mentioned, showed "left, moderate to severe lumbosacral radiculopathy of the nerve roots of L4/ L5 and S1," with "active denervation and reinnervation" of the muscle groups supported by those nerves.

Although the ALJ addresses the Plaintiff's emergency room visit at Passavant Hospital in 2008, she mentions that the MRI was negative but did not note the positive straight leg raising tests.

14

Based on the foregoing, there is a factual issue as to whether the Plaintiff's degenerative disc disease satisfied Listing 1.04A. In Minnick v. Colvin, 775 F.3d 929 (7th Cir. 2015), the Seventh Circuit noted that a claimant's potential nerve root compression, in conjunction with his testimony of a limited ability to use his fingers, which suggested motor loss accompanied by reflex loss, and along with positive straight leg tests, might be enough to show that the claimant's degenerative disc disease satisfied Listing 1.04A. See id. at 936. The court in Minnick explained:

> We cannot discern from the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated. Moreover, the ALJ never sought an expert's opinion as to whether any of the evidence could support a finding of equivalency. . . . Thus, the ALJ erred by failing to build a logical bridge from the evidence to her conclusion.

Id. (citation omitted).

The record here consists of similar medical findings. This includes positive straight leg raising tests, decreased sensation, numbness and diminished muscle strength in the left leg, diminished reflexes at the knees and ankles and weakness in dorsiflexion and plantar flexion.

15

Although the ALJ need not address every piece of evidence presented, she must engage in more than a cursory analysis when determining whether a claimant's condition meets or equals a listed impairment.  See Kastner v. Astrue, 697 F.3d 642, 647 (7th Cir. 2012).  Accordingly, the ALJ cannot simply "cherry-pick" those facts which support a finding of no disability, while ignoring other evidence.  See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).  The Commissioner states that the ALJ's analysis in other portions of the record establishes that Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings.

Because it is not apparent that the ALJ considered some of the evidence which might support a finding that the Plaintiff's condition meets a listed impairment, however, the Court is unable to determine whether this aspect of the decision is supported by substantial evidence.

And because it is not apparent whether the ALJ considered all of the evidence, the Court cannot determine whether the Plaintiff does or does not have an impairment or combination of impairments that meets or medically equals Listing 1.04A.

16

(2)

The ALJ also states that Plaintiff is able to "ambulate effectively and use his hands for fine and gross manipulations." R. 17.  The Plaintiff notes his testimony was that he could not walk on rough or uneven surfaces for a block or possibly at all.  He described walking up to 100 feet before having to rest for ten minutes or more, depending upon the amount of pain.  The Plaintiff used a cane which he said was prescribed.  On occasions when he went to the store, the Plaintiff used an electric scooter to get around, or leaned on the cart and dragged his leg.

The Listing at 1.00(2)(b)(2) describes non-exclusive examples of effective and ineffective ambulation:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single

17

hand rail.

Although undoubtedly there are cases when an individual exaggerates his symptoms, it is worth noting there is objective evidence which supports the Plaintiff's statements about his difficulty ambulating.  Dr. Hinchen and Dr. Bashir both noted his trouble walking.  Dr. Hinchen observed the Plaintiff walked "haltingly."   Dr. Pineda stated the Plaintiff had "weakness and numbness of the entire left leg" and noted the Plaintiff's difficulties flexing his hip, flexing and extending his knee, dorsi and plantar-flexing his foot. Dr. Bashir noted the Plaintiff's constant pain was exacerbated by walking. He further observed there were leg cramps or pain in the legs when walking even short distances.

The ALJ does not address some of this medical evidence.  It is not apparent from the record whether she considered the effects of pain on the Plaintiff's ability to ambulate effectively or ineffectively.

Because the ALJ has not adequately analyzed whether the Plaintiff's degenerative disc disease of the lumbar spine  meets or medically equals the severity of one of the listed impairments, the Court finds that the decision

is not supported by substantial evidence and must be reversed.

### C. Credibility finding

The Plaintiff also alleges that the ALJ's credibility findings are patently wrong and violate the regulatory standards for credibility assessment.  The ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

See Tr. 19.  The United States Court of Appeals for the Seventh Circuit has criticized this or similar language that frequently appears in administrative law judge's decisions as "meaningless boilerplate."  See Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010).

The use of the often-criticized boilerplate language by itself is not enough to warrant reversal and support a finding of disability.  The use of such language is harmless if the ALJ provides additional reasons for her finding.  See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Shideler

v. Astrue, 688 F.3d 306, 311-12 (7th Cir. 2011).

The ALJ found that progress notes showed the Plaintiff's pain was controlled with medication.  Moreover, his condition improved with conservative treatment and surgery was not recommended.  Although she noted that Plaintiff's daily activities were somewhat limited, the ALJ found that the records and treatment notes do not support the limitations he may have imposed upon himself.

The Defendant notes that the ALJ considered the objective medical evidence, the conservative treatment, the Plaintiff's inconsistent statements and his activities of daily living.  The ALJ observed that the Plaintiff was not interested in lumbar epidural steroid injections, which suggested to the ALJ that Plaintiff did not require the medical treatment to function and the impairments were not as limiting as he claimed.  On more than one occasion, Dr. Bashir recommended that Plaintiff stop smoking and lose weight.

Even though medication may have provided some relief, the Plaintiff consistently complained of back and leg pain and was assessed with chronic

pain.  He consistently had hypoesthesia, an antalgic gait and always had some degree of muscle spasm in his back.  Accordingly, even accepting that Plaintiff obtained some relief by taking powerful narcotics such as morphine and hydrocodone, the Plaintiff claims that is not a reason for the Court to reject his testimony that movement exacerbated his pain and he limited his activities for that reason.  As the Plaintiff notes, a pain specialist referred to the Plaintiff's functioning as poor.

The ALJ did note some inconsistencies with the Plaintiff's statements regarding the amount of pain and the effect on his daily activities. Moreover, there is some evidence which indicates his condition  improved over time and that his pain was controlled with medication.

Having determined that the analysis at step three is not supported by substantial evidence, the Court need not consider whether the ALJ's credibility findings regarding the intensity, persistence and limiting effects of his symptoms are supported by the record.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 10] is ALLOWED.

The Defendant's Motion for Summary Affirmance [d/e 15] is DENIED.

The Commissioner's Decision is Reversed and the action is Remanded.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment.  This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion.

ENTER: April 27, 2016

FOR THE COURT:

 s/Richard Mills
Richard Mills
United States District Judge